**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

CARLIN DAVID KEPP,                                    Case No. 1:10-cv-542

     Plaintiff,                          Dlott, J.
                                                       Bowman, M.J.
  v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

     Defendant.


**REPORT AND RECOMMENDATION**

   Plaintiff Carlin David Kepp filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents four claims of error, all of which the Defendant disputes.  As explained below, I conclude that the finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

  **I.  Summary of Administrative Record**

   This appeal concerns Plaintiff's second unsuccessful application for Disability Insurance Benefits (DIB).  Plaintiff first filed a DIB application in 2003.  After Plaintiff's first claim was denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge ("ALJ").  Following an evidentiary hearing at which Plaintiff was represented by different counsel than appears in the present case, ALJ Larry Temin issued a written opinion, dated June 23, 2005, in which he determined that Plaintiff retained the residual functional capacity ("RFC") to perform a range of

sedentary work and was not disabled.[1] (Doc. 10-1 at 6–17).  Plaintiff filed no further appeal of the June 23, 2005 denial of benefits.

Instead, Plaintiff filed a new application for DIB in July 2007, alleging a new disability onset date of June 24, 2005.  Plaintiff alleges to be disabled based upon his back pain, lung disease, carpal tunnel syndrome, and depression, evidence of which is discussed more fully in the body of this report.  After Plaintiff's second claim was denied initially and upon reconsideration, he again requested a hearing *de novo* before an Administrative Law Judge.  On June 23, 2009, a new ALJ, Steven A. De Monbreum, held an evidentiary hearing by videoconference at which Plaintiff was represented by new counsel.  The ALJ heard testimony from Plaintiff, Plaintiff's wife, and Vocational Expert ("VE") James Williams.  (Doc. 6-2 at 24-65).

At the hearing, Plaintiff testified that his educational background is limited; he achieved only an eighth or ninth grade education before leaving school. (Doc. 6-2 at 28-29).  He can read a newspaper and do simple addition and subtraction, but cannot read anything with "big words" or perform multiplication or division. (*Id*.).  Plaintiff's employment history primarily is limited to carpentry work and manual labor in the construction industry; he last worked in 2002.  (*Id*. at 55).

On August 5, 2009, ALJ De Monbreum issued a written decision in which he determined that Plaintiff retained the ability to perform a limited range of light work, and therefore was not disabled.  (Doc. 6-2 at 13-24).  The Appeals Council denied Plaintiff's request for further review.  Therefore, the ALJ's decision stands as the Defendant's final determination.

---

[1]The 2005 decision was not included in the administrative record, but instead was attached as an exhibit to Plaintiff's statement of errors.  Defendant does not dispute the authenticity of the exhibit.

The ALJ's "Findings," which represent the rationale of the 2009 decision, were as follows:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 24, 2005 through his date last insured of December 31, 2007 (20 CFR 404.1571 *et seq.*).

3.   Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, chronic obstructive pulmonary disease, sleep apnea, and depression (20 CFR 404.1520(c)).

     .................

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

     .................

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for that which involves climbing ladders/ropes/scaffolds, requires frequent fine manipulation, or involves concentrated exposure to fumes, odors, dusts, gases, or poor ventilation.  Limitation imposed by depression further limited claimant to low-stress jobs (those that do not require high or strict production quotas) that involve only simple, repetitive tasks and do not require more than minimal interaction with the public.

(Doc. 6-2 at 15-17).  In addition, the ALJ determined:

6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

     .................

7.   The claimant was born on September 16, 1960 and was 47 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.   The claimant has a limited education and is able to communicate in English (20 CFR 416.1564).

3

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

........... .......

10.   Through the dated [sic] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

...................

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from June 24, 2005, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(g)).

(*Id.* at 22-23).   Thus, the ALJ concluded that Plaintiff was not entitled to disability insurance benefits.

On appeal to this court, Plaintiff asserts that the ALJ committed four errors: 1) he relied upon vocational expert testimony that was inconsistent with the Dictionary of Occupational Titles; 2) he departed from ALJ Temin's prior conclusion that Plaintiff could perform only sedentary work; 3) he discredited Plaintiff's testimony concerning his lung impairment based upon an erroneous conclusion that Plaintiff continued to smoke; and 4) he improperly discounted the opinion of Plaintiff's treating physician.

**II.  Analysis**

**A.  Judicial Standard of Review**

To be eligible for DIB, a claimant must be under a "disability" within the definition of the Social Security Act.   *See* 42 U.S.C. §1382c(a).   Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1)

4

performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner

determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v.  Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he or she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him or her unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

In this case, Plaintiff alleges that the four previously referenced errors require remand back to the Commissioner.  Upon review, it is clear that the ALJ committed no error in concluding that Plaintiff is not disabled, and that the Commissioner's determination is supported by substantial evidence.  Therefore, the Commissioner's decision should be affirmed.

### B.  Specific Errors Asserted

### 1.  Reliance on Vocational Expert Testimony

Plaintiff first asserts that remand is required because the ALJ relied upon vocational expert testimony that itself was unreliable. Generally, a vocational expert's testimony in response to a hypothetical question accurately portraying the claimant's physical and mental impairments provides substantial evidence in support of the Commissioner's decision that the claimant is not disabled.  *See Davis v. Secretary of*

*Health and Human Services,* 915 F.2d 186, 189 (6th Cir. 1987).  In this case, however, Plaintiff complains that the VE testified that Plaintiff could perform certain jobs, but that Plaintiff's limitations would preclude him from performing those jobs as they are described in the Dictionary of Occupational Titles ("DOT"), *see* http://www.oalj.dol.gov/libdot.htm.[2]  For example, although the ALJ stated that Plaintiff could perform no work that requires "frequent fine manipulation or involves concentrated exposure to fumes, odors, dust, gases, and poor ventilation," (Doc. 6-2 at 55-56), the VE identified garment sorter, laundry worker, and garment folder in manufacturing as three specific jobs that Plaintiff could perform.  (*Id.* at 57).  Plaintiff now argues that all three positions either require fine manipulation or involve concentrated exposure to fumes, and are contrary to his stated limitations.

For example, because the DOT description for "garment sorter" states that the position "may" require ironing, Plaintiff hypothesizes that the position "may" also require frequent fine manipulation and/or expose the worker to steam, fumes, odors or other chemicals, especially in poorly ventilated areas.  Similarly, Plaintiff suggests that because the DOT description states that a laundry worker "may perform other housework," that same housework "may" require performance at a higher (medium) exertional level than Plaintiff's abilities would permit.

Plaintiff's first two arguments are speculative at best.  The DOT descriptions do not *require* the tasks or conditions that Plaintiff suggests might exist for the referenced

_____

[2]The DOT was originally created by the Employment and Training Administration, and was last updated in 1991.  It has largely been replaced by the O*Net but continues to be used as a reference source in Social Security cases.

positions, and the VE clearly testified that Plaintiff could perform positions within the referenced categories at the "light" level with the limitations ascribed to him.

Plaintiff's complaint concerning the third position, a garment folder in the manufacturing industry, is equally unavailing.  Plaintiff argues that the VE erred because the position he testified to is in the "medium" strength level category, not the light category.  Indeed, the precise numerical DOT classification testified to by the VE, DOT 369.865-026, appears to be for a "rug-dry-room attendant" that is classified at the Medium Exertional level rather than for the position of "garment folder."  (See Doc. 6-2 at 57).  However, just because a VE's testimony concerning the existence of specified jobs is contrary to the precise description listed in the DOT "does not establish that [the jobs] do not exist." *See Beinlich v. Comm'r of Soc. Sec.*, 345 Fed. Appx. 163, 168, 2009 WL 2877930 *4 (6th Cir., Sept. 9, 2009).  In any event, the job title of "garment folder" in manufacturing exists under a different number, DOT 789.687-066.  Consistent with the VE's testimony in this case, the latter classification refers to a garment worker at the "Light" exertional level.  Based upon a review of the VE testimony, it appears that the VE may have inadvertently referenced the correct job title, but wrong numeric code.  Such an error is harmless.

In addition to the fact that Plaintiff's arguments concerning any discrepancies between the VE testimony and the DOT classifications are speculative, a review of the administrative record finds no legal error.  Plaintiff relies on *Young v. Commissioner of Social Security*, 351 F. Supp.2d 644 (E.D. Mich. 2004).  However, in that case, remand was required because the vocational expert testified to a clear conflict between his opinion concerning the plaintiff's abilities and descriptions listed in the DOT, but the ALJ

8

failed to reconcile that conflict.  *Id.,* 351 F. Supp.2d at 652.   Even in *Young*, the court acknowledged that an "ALJ may rely on a vocational expert found to be credible even if the witness' conclusions are contrary to the DOT."  *Id.*

In contrast to *Young*, no conflict was identified by the VE at Plaintiff's hearing. The ALJ did all that was required by social security regulations by inquiring about conflicts.  Soc. Sec. Rul. 00-4p imposes an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided "conflicts with [the] information provided in the DOT."  Only if the VE testifies that there is a conflict must the ALJ "obtain a reasonable explanation for...[the] apparent conflict."  *Lindsley v. Commissioner of Social Security*, 560 F.3d 601, 603 (6th Cir. 2009).

*Lindsley* provides an example of an alleged "conflict" similar to that presented in this case. There, a VE testified that: 1) the plaintiff could perform the job of a "light, unskilled production inspector."  *Id.*, 560 F.3d at 604.   Although the VE additionally testified that there was "no discrepancy between his opinion and the DOT," the plaintiff pointed out on appeal that the "occupations listed in the DOT do not include the job description of a 'light, unskilled production inspector.'"  *Id.* at 604-605.  The Sixth Circuit affirmed the district court's conclusion that the ALJ's determination was supported by substantial evidence.  The appellate court found no actual conflict between the DOT and the VE's testimony, given that "the DOT's job classifications are collective descriptions of 'occupations' that can encompass numerous jobs."  *Id.* at 605.  The use of different terminology, or the fact that the VE's job description did not "align perfectly with the DOT's listed occupation titles" is not evidence of a conflict.  *Id.*  Thus, once the VE credibly testified that there was no conflict between his testimony and the DOT, and

plaintiff was afforded a full opportunity to cross-examine, the ALJ had no duty to interrogate him further.  *Id.*  at 606.

Here as in *Lindsley*, the ALJ satisfied his affirmative duty to ask the VE if his testimony was consistent with the DOT.  The VE testified that his descriptions were consistent, and that he would notify the ALJ if conflicts arose.  (Doc. 6-2 at 53-54).  None were ever identified, either by the VE or by the Plaintiff until now.

The ALJ is not required "to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge."  *Ledford v. Astrue*, 311 Fed. App'x 746, 757 (6th Cir. 2008).   Because Plaintiff did not object to the conflicts at the hearing, the ALJ had no duty to explain how any conflict was resolved.  *See Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 374-75 (6th Cir. 2006)(affirming where VE's testimony was inconsistent with the DOT as to two of three jobs that he testified plaintiff could perform, because the plaintiff failed to raise the conflict at the administrative level, and "the ALJ still could have reasonably found that Martin could perform the third position."); *see also generally Coleman v. Astrue*, 2010 WL 4094299 (M.D. Tenn. Oct. 18, 2010)(discussing cases requiring remand based on conflicts between VE testimony and DOT).

In sum, neither obvious conflict nor legal error exists between the VE's testimony and the DOT on the record of this case.  To the extent that any discrepancy can be found, it is not grounds for remand because the ALJ satisfied his legal duty to inquire about conflicts at the time of the hearing, and Plaintiff failed to point out the alleged conflict at the administrative level.

10

### 2.  Acquiescence Rule 98-4(6)

Plaintiff's second claim of error is that ALJ De Monbreum failed to comply with Acquiescence Rule ("AR") 98-4(6), because he departed from ALJ Temin's 2005 conclusion that Plaintiff could only perform work at a sedentary level in concluding that Plaintiff could perform a limited range of work at the more rigorous "light" exertional level.  The relevant administrative rule, AR 98-4(6), holds that a previously determined RFC must be used in any subsequent proceeding, absent new evidence.

Social Security regulations divide the physical requirements of jobs into five exertional levels, with "sedentary work" requiring the least amount of exertion, and "light work" requiring slightly more exertion:

> a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CFR § 404.1567.   ALJ Temin determined in 2005 that Plaintiff could perform nearly a full range of sedentary work (Doc. 10-1 at 13), but ALJ De Monbreum determined that Plaintiff could perform a more limited range of light work.

At the outset of his written opinion, ALJ De Monbreum stated: "As will be explained in the evaluation that follows, new and material evidence requires revision of the residual functional capacity found by Administrative Law Judge Temin." (Doc. 6-2 at 13). Plaintiff claims error on the basis that many of Plaintiff's complaints stem from chronic diseases, such as degenerative disc disease and COPD, which reasonably could be expected to worsen over time.

In *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997) as in this case, the claimant had completed sequential applications for disability insurance benefits. In rejecting the claimant's first application, the Commissioner determined after a hearing before an ALJ that she was capable of sedentary work. At the time of her first application, the claimant was a "younger" individual. Plaintiff completed a subsequent application at a time when she was a "person approaching advanced age." Had the Commissioner made the same determination that she was capable of only sedentary work, she would have been entitled to benefits based upon the combination of her new age classification and RFC. Instead, the Commissioner determined that, despite being older, she was capable of "medium" work. Applying principles of *res judicata*, the Sixth Circuit held that an ALJ is bound by the RFC determined by a prior ALJ after an evidentiary hearing, absent proof of "changed circumstances," or substantial evidence that the claimant's condition improved between the two hearing dates. *Id.* at 843. The Commissioner retains the burden of persuasion on the issue of improvement. *Id.*

Plaintiff argues that ALJ De Monbreum never identified what specific "new and material" evidence existed to upgrade the determination of Plaintiff's RFC to "light" work from ALJ Temin's prior conclusion that Plaintiff was capable of only sedentary work.

However, no case law requires that an ALJ specifically articulate each and every piece of evidence that was "new and material."  Neither *Drummond* nor AR 96-4(6) contain any such formalistic requirements.  Rather, so long as substantial evidence supports the ALJ's conclusion that "new and material evidence requires revision of the residual functional capacity found by Administrative Law Judge Temin," this Court will affirm. *Accord Williams v. Astrue*, 2010 WL 503140 (E.D. Tenn. Feb. 8, 2010)(failure to expressly point out which evidence was relied on was not error, where ALJ discussed evidence post-dating prior ALJ's opinion); *Collier v. Commissioner of Soc. Sec.,* 108 Fed. Appx. 358 (6th Cir. 2004)(substantial evidence supported RFC for restricted range of heavy work despite earlier decision finding RFC limited to light or sedentary work, where additional medical evidence was obtained subsequent to original decision); *Chandler v. Commissioner of Soc. Sec.*, 124 Fed. Appx. 355 (6th Cir. 2005)(substantial evidence supported ALJ's change in Plaintiff's RFC).

The period under consideration runs from June 24, 2005 - the day after ALJ Temin issued his decision - until December 31, 2007 - the date Plaintiff was last insured.  As noted by Defendant, the overwhelming bulk of the medical evidence submitted by Plaintiff and reviewed by ALJ De Monbreum dates from September 2005 forward.  As such, virtually *all* of the medical evidence in this case was "new and material" since the date of ALJ Temin's decision.  Because the vast majority of the medical evidence relied upon by ALJ De Monbreum was new since the prior 2005 determination of Plaintiff's RFC, ALJ De Monbreum had a much more complete picture of Plaintiff's limitations than was previously available to ALJ Temin.

Prior to turning to the question of whether the Commissioner has carried its burden to show that the evidence demonstrates improvement, however, the Court addresses the Commissioner's alternative argument that even if ALJ De Monbreum erred in failing to accept ALJ Temin's RFC finding that Plaintiff was limited to sedentary work, any error was harmless.

In *Drummond*, the error was significant because the claimant had "aged up" to the extent that a sedentary RFC level in combination with her age category would have entitled her to benefits.  Here, by contrast, Plaintiff continued to be considered a "younger" individual at the time of the Commissioner's more recent decision.  Although Plaintiff compares himself favorably to Ms. Drummond, arguing that he too would automatically qualify for benefits if now limited to sedentary work, the Defendant correctly points out that Plaintiff's age would preclude him from that finding.  Thus, the Defendant asserts that the non-disability decision would be unaffected by the alleged error.

Of course, the Defendant's argument presupposes that jobs continue to exist in the economy consistent with ALJ Temin's prior conclusion that Plaintiff can perform a wide range of sedentary work.  Although that may be a likely conclusion, this Court is unwilling to draw it absent some evidence in the record that relevant jobs continue to exist.  *Drummond* spoke to a prior determination of a claimant's RFC and did not address the issue of jobs.  Considering changes in the economy over time, the proposition that prior VE testimony concerning the existence of jobs at an earlier time

should presumptively bind the parties into the future is less convincing than the proposition that an earlier RFC should be binding.[3]

Nevertheless, I find no error in the ALJ's new determination that Plaintiff could perform a limited range of "light" work in this case, because substantial evidence supports a finding of improvement over the 2005 RFC determination.  That evidence, spelled out in the ALJ's lengthy analysis of Plaintiff's medical records, includes: 1) Plaintiff's frequent statements that he was visiting doctors primarily in order to bolster his disability claim; 2) objective medical records including multiple MRIs, a 2008 EMG, and clinical findings from multiple physicians in 2007 that failed to support significant restrictions; and 3) the opinions of state agency consulting physicians.

First, Plaintiff's repeated statements to his own physicians that the purpose of his visits was to secure disability benefits supports ALJ De Monbreum's conclusion that Plaintiff was not as impaired as ALJ Temin believed in 2005.  As noted by ALJ De Monbreum, "records from Dr. Provaznik make repeated references to claimant's statements concerning his desire to enhance his claim for disability benefits." (Doc. 6-2 at 20).  Plaintiff began treating with Dr. Provaznik several months after his prior DIB claim was denied.  "Notably, claimant indicated [to Dr. Provaznik] that his application for disability benefits had been denied due to 'infrequent doctor visits' and that he was 'going to try and rectify that by coming here to make his record look better.'" (Doc. 6-2 at 18, *see* Doc. 6-7 at 204).  Dr. Provaznik referred Plaintiff for an MRI, which did show

---

[3]Adding to the concern about whether Plaintiff could perform the same jobs are additional limitations found by the ALJ in 2009. including: 1) a restriction on fine manipulation; 2) environmental limitations; and 3) greater mental limitations.  (Doc. 6-2 at 17).

severe discogenic changes at L5-S1 very similar to a prior 2003 MRI.  However, the 2005 MRI failed to show any evidence of nerve root impingement.

As the ALJ noted, Plaintiff frequently would not return to Dr. Provaznik for several months at a time.  When he did return, office notes continued to reflect Plaintiff's comments that he had scheduled follow-up appointments only because "disability requires it to improve his disability claim" (Doc. 6-7 at 191, note of 8/15/06) and that Plaintiff requested a referral to a specialist, Dr. Welsh, because he was "still trying to build his SSI case."  (Doc. 6-7 at 190, note of 9/12/06).  A note dated May 18, 2007 similarly reflects that Plaintiff was "continuing to try to get disability and making his disabilities look good."   (Doc. 6-7 at 178).  (*Accord*, *see* Doc. 5-7 at 198 (4/25/06 note that Plaintiff "is trying to come up with all his diagnosis [sic] as he is applying for SSI"); Doc. 6-7 at 172 (9/14/07 note reflecting Plaintiff "having a hard time getting his disability"); Doc. 6-7 at 171 (11/8/07 note reflecting Plaintiff "is looking for disability"). The ALJ did not err in relying upon Plaintiff's own statements - recorded on numerous occasions by his physicians- to discredit Plaintiff's accounts of disabling pain due to degenerative disc disease and other impairments.

In addition to Plaintiff's statements to his doctors, both objective and clinical records support ALJ De Monbreum's conclusion that Plaintiff is capable of a limited range of "light" work.  Plaintiff argues that several of his conditions were worse or new since the 2005 determination, including sleep apnea and carpal tunnel syndrome. However, medical evidence reflected that Plaintiff's sleep apnea was successfully treated (Doc. 6-7 at 13), and ALJ De Monbreum appropriately considered his carpal

tunnel syndrome when he added a fine manipulation restriction not previously found by ALJ Temin.

.      With respect to his exertional limitations, Plaintiff's primary complaint is his degenerative disc disease, which the ALJ determined causes no more than "tenderness and restricted range fo motion" without neurological deficits or other impairment that would restrict him to less than the "light" exertional category of work.   The ALJ's determination is supported by clinical records.  (*See, e.g.*, Doc. 6-7 at 251).

Plaintiff argues that two records show that his back condition supports a more restrictive RFC, as determined in 2005. On February 1, 2007, Dr. Terrence Welsh examined Plaintiff at the request of Plaintiff's primary care physician, Dr. Provaznik.  Dr. Welsh notes Plaintiff's report that he sees a chiropractor at times when his back "goes out," and that "this usually returns [him] to baseline in about 3 weeks."  (Doc. 6-7 at 13). The same record reflects that Plaintiff's gait, though slow, was "normal."  Dr. Welsh specifically notes that Plaintiff has not had surgical consultation, physical therapy, or injection for his back pain, and that Plaintiff has tried only conservative treatment with "some anti inflammatory medication" that upset his stomach.  (*Id*.).  Dr. Welsh refers to objective reports (2003 and 2005 MRI reports) that demonstrate "severe progressive 1 level degenerative disk disease at L5-S1."  (*Id.* at 14).  However, considering Plaintiff's lack of treatment, Dr. Welsh recommends only "the usual conservative measures" including additional x-rays, physical therapy, and a nonsteroidal anti inflammatory medication with follow-up in 4 weeks to determine progress.  (*Id.*).  The follow-up x-rays recommended by Dr. Welsh were "notable only for disc space narrowing at the

lumbosacral junction." (Doc. 6-2 at 19). Therefore, Dr. Welsh's 2007 report does not support greater limitations than those found by ALJ De Monbreum.

The second record on which Plaintiff relies is an MRI report dated August 7, 2007 that uses as a basis for comparison a similar imaging study performed in September 2005. (Doc. 6-7 at 253-254). The 2007 report finds only "very mild broad disc bulging" with no "severe foraminal or central canal narrowing" at L5-L5. (*Id.* at 253). The only significant finding in the 2007 report is at L5-S1, which reflects "a moderate broad-based disc bulge/protrusion with moderate impingement upon the thecal sac....This may be slightly larger when compared with the previous [2005] exam." (*Id.* at 254). Despite the suggestion that Plaintiff's back condition "may" have worsened since 2005, the 2007 report clearly states that the findings "should be correlated with the physical exam and patient's clinical history" including "correlation with electromyography." (*Id.*).

Ultimately, physical exam records and electromyography results failed to reflect any worsening of Plaintiff's back condition. Plaintiff sought the EMG "to see [if] it can help his [disability] case." (Doc. 6-7 at 217). To the contrary, Plaintiff's EMG was "normal." Strength and reflects were intact, and the study found no abnormalities, including "no ongoing radiculopathy, neuropathy, myopathy, or peripheral impingement syndrome" (Doc. 6-7 at 249).

As discussed, Dr. Welsh's February 2007 examination also found Plaintiff's gait to be normal. An examination by Dr. Fulton for neurosurgical consultation on July 5, 2007 found "grossly symmetric and normal" motor examination with coaxing, despite some restriction in Plaintiff's range of motion due to pain. (Doc. 6-7 at 250-251).

Plaintiff's other medical conditions also fail to support an RFC more restricted than the "light" exertional category of work.  Medical records show that Plaintiff's COPD improved with treatment and required no ongoing specialized treatment.  (Doc. 6-7 at 5-6).  Similarly, Plaintiff's mental capacity does not negatively impact his exertional abilities to lift, stand, or walk.  It is noteworthy that even Plaintiff's treating physician, Dr. Provaznik, believed that Plaintiff was capable of light level lifting.  (Doc. 6-7 at 210-212).

In terms of non-exertional limitations, ALJ De Monbreum fully considered and incorporated the effect of Plaintiff's depression into his RFC, by adding restrictions to those previously found by ALJ Temin.  Plaintiff places great weight on a single GAF score assessment from a social worker in 2008,[4] but that document has no obvious relation back to the 2007 date that Plaintiff was last insured.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  By contrast, a November 2007 clinical note describes Plaintiff's depressive symptoms as much improved, with Plaintiff reporting that prescribed medications were "wonderful."  (Doc. 6-7 at 171).  In an October 26, 2007 examination by a consulting psychologist, Dr. Thomas Heiskell found that Plaintiff was only mildly limited in his ability to understand and follow directions, and that he could perform simple repetitive tasks.  (Doc. 6-7 at 139).

The opinions of consulting physicians provide a third ground for ALJ De Monbreum's determination that Plaintiff could perform a limited range of "light" work.  Consulting physician Gerald Klyop, M.D., upon whose November 19, 2007 opinion ALJ

_____

[4]Other 2008 records from the same facility reflect a much rosier outlook.  For example, a record dated 9/3/08 reflectst that the Plaintiff had been spending "meaningful time with his grandchildren and family" and "plans to visit a friend this afternoon."  (Doc. 6-7 at 261).  Again, while the 2008 records have no clear relation back to the period of alleged disability, it is worth noting that they are not as a whole as dire as the single record upon which Plaintiff relies.

De Monbreum relied, completed a residual functional capacity assessment that reflects that he examined "new and material changes" reflected in more current medical records.  "[T]he current evidence does not support such severe limitations as given by the ALJ in the past. [Claimant] has a h/o lumbar DDD.  In 5/07, he was noted to be able to move around well.  Lungs were clear and heart RRR.  Back exam in 3/07 noted no instability on flexion and extension."  (Doc. 6-7 at 161).   A second consulting physician, Arthur Sagone, M.D. affirmed Dr. Klyop's new RFC determination following his review of Plaintiff's records on March 18, 2008. (Doc. 6-7 at 207).

Plaintiff argues that Dr. Klyop did not have access to Dr. Provaznik's complete records or to the Shawnee Mental health records.  However, as discussed, even Dr. Provaznik believed Plaintiff capable of "light" level lifting, and Plaintiff's mental health restrictions - to the extent that evidence existed while Plaintiff remained insured - were also adequately considered and incorporated.

Finally, evidence of Plaintiff's activities also supports ALJ De Monbreum's conclusion that Plaintiff was capable of at least a limited range of light work.  At an appointment on May 15, 2008, Plaintiff reported that he had been "babysitting for a grandson 4 days a week."  (Doc. 6-7 at 215).  In March 2008, Plaintiff reported pain in his leg "after ...chasing his grandson around for a couple wks."  (Doc. 6-7 at 219).  At an earlier visit within the claimed disability period of 2007, Plaintiff reported enjoying his recent vacation to Florida.  Such activities are consistent with the ALJ's determination that all new and relevant evidence since the 2005 determination of Plaintiff's RFC supported a finding that Plaintiff was physically capable of at least a limited range of "light" work.

20

### 3.  Three Alleged Factual Errors

In his third statement of error, Plaintiff contends that the ALJ made three factual errors: 1) in determining that Plaintiff continued to smoke cigars during the relevant disability period; 2) in determining that there was no evidence that claimant had sought mental health treatment; and 3) in failing to discuss Plaintiff's complaints of pain. Because the ALJ's determination of the facts and credibility assessment was reasonable, I find no error in any of the three findings.

First, regarding Plaintiff's credibility, the ALJ noted that his wife testified that he continued to smoke cigars - "a practice one would expect him to have discontinued if pulmonary impairment were as severe as he maintains." (Doc. 6-2 at 20).  Pointing out that Plaintiff's wife testified that he had stopped smoking, Plaintiff argues that the ALJ was "not listening to the answers of his own questions." (Doc. 10 at 6).  However, even though Plaintiff's wife testified at one point that Plaintiff had stopped smoking, at another point her testimony was more equivocal, suggesting that he continued to smoke at the time of the hearing, but "not very often at all."  (Doc. 6-2 at 48).  Plaintiff himself also testified on June 23, 2009, the date of the hearing, that he quit smoking cigars "about a year ago," or in June 2008.  (Doc. 6-2 at 36).   Plaintiff was only insured through 2007, and multiple medical records reflect that Plaintiff reported to his physicians that he continued to smoke through 2007.  (Doc. 6-7 at 5-6, 14, 57, 136 (report dated 10/2007 that he was smoking one cigar daily but trying to quit)).

Plaintiff also complains that the ALJ erroneously stated that "there is no evidence that claimant has ever sought or been referred for treatment by a mental health professional," thereby ignoring 15 pages of records from the Shawnee Mental Health

Center.  However, there is no clear relation back of those records to the period of Plaintiff's alleged disability, which expired in 2007.  Plaintiff did not seek treatment at the center until July of 2008 after being referred there by his attorney (Doc. 6-7 at 256).  Plaintiff's records and testimony reflect that he received some treatment for depression in 2007, but that a prescribed medication proved helpful.[5]  (Doc. 6-7 at 137).  ALJ De Monbreum noted that Dr. Provaznik's November 8, 2007 clinical notes reflect Plaintiff's report that his depressive symptoms were "much better" and that he had been able to "enjoy things emotionally" while on a vacation to Florida.  (Doc. 6-2 at 20).  Dr. Heiskell also examined Plaintiff during the relevant period in question, in October 2007, and found Plaintiff to be only "mildly" or "moderately" limited in a few discrete areas.  The ALJ considered those findings by concluding that Plaintiff was mildly limited in his ability to understand and follow directions and perform simple repetitive tasks, and that Plaintiff was limited to "low-stress jobs" involving "simple, repetitive tasks" and not requiring "more than minimal interaction with the public."  (Doc. 6-2 at 17, 21).

The last alleged factual "error" Plaintiff presents is the ALJ's failure to discuss the effects of Plaintiff's pain medication.  Plaintiff's records concerning his use of pain medication are somewhat inconsistent, as a record dated July 5, 2007 reflects that Plaintiff had taken no pain medication for "a few months."  (Doc. 6-7 at 250).  The ALJ referred to another portion of the same July 2007 record but did not directly address the use of pain medication.

---

[5] Plaintiff also complains that the ALJ never mentioned his diagnosis of obsessive compulsive disorder as causing any limitations.  However, a diagnosis alone is not evidence of limitations, and Plaintiff offered neither testimony nor other evidence to support additional limitations resulting from that diagnosis.

22

In any event, Plaintiff fails to explain how his sporadic use of pain medication caused further limitations.  As discussed above, the ALJ adequately explained his reasons for discounting Plaintiff's reports of disabling pain such that the lack of reference to pain medication was - if error at all- harmless in this case.

### 4.  Rejection of Treating Physician Opinions

Plaintiff's fourth statement of error charges that the ALJ improperly discounted the 2008 opinions of his treating physician, Dr. Provaznik, in favor of the opinion of a consulting physician who did not review Dr. Provaznik's records.

It must be noted that the ALJ did not reject all of Dr. Provaznik's opinions.  For example, as mentioned, the ALJ's conclusion that Plaintiff was capable of "light" level lifting was consistent with Dr. Provaznik's April 2008 determination.  ALJ De Monbreum also imposed restrictions on Plaintiff's ability to perform any job involving climbing ladders/ropes/scaffolds, or requiring frequent fine manipulation, consistent with Dr. Provaznik's opinions.  Finally, taking into regard Plaintiff's lung disease, the ALJ limited Plaintiff to jobs that did not involve concentrated exposure to fumes, odors, dusts, gases, or poor ventilation.

However, the ALJ did reject Dr. Provaznik's assessment that Plaintiff was unable to stand or walk for 2 hours in an 8-hour period, or to sit more than 30 minutes at a time up to a total of 4 hours in an 8-hour period,[6] concluding instead that Plaintiff was capable of sitting, standing or walking for 6 hours in an 8 hour period.  The ALJ also arguably rejected - at least in part- Dr. Provaznik's June 2, 2008 opinion that based on

---

[6]The restriction on sitting at least was apparently added in response to Plaintiff's request.  (Doc. 6-7 at 218).  Dr. Provaznik refers to making "addendums" at Plaintiff's request, but the full extent of the addendums is not apparent from the records themselves.

Plaintiff's obstructive lung disease, which he classified as "mild to moderate" in nature,[7] the Plaintiff would be unable to perform "any meaningful occupation requiring a good deal of exertion." (Doc. 6-2 at 20).

While it is debatable whether the ALJ's determination of Plaintiff's RFC would ever require Plaintiff to perform a "good deal of exertion," there is no question that the ALJ did not believe Plaintiff's obstructive lung disease to be disabling.  However, the ALJ's determination in this regard is supported by substantial evidence.  As the ALJ noted, pulmonary function testing in December 2006 showed Plaintiff's condition to be mild in severity, and there is no evidence that Plaintiff has ever required treatment in an emergency room or ongoing management by a pulmonary specialist.  Plaintiff's smoking habits through the period of alleged disability have been discussed and lend further credence to the ALJ's conclusions.  ALJ De Monbreum also noted that Dr. Provaznik's assessment of Plaintiff's physical limitations "was rendered more than three months after claimant last met the disability insured status requirements" and that the assessment was "not supported by [Dr. Provaznik's] own treatment records." (Doc. 6-2 at 20).

Plaintiff argues that Dr. Provaznik's opinions should have been given controlling weight.  The Social Security regulation pertinent to evaluation of a treating physician's opinion states: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

---

[7]The same letter inexplicably describes Plaintiff as having a "pulmonary status of moderate to severe." (Doc 6-7 at 209).

evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  In determining the weight to give to any medical source opinion, an ALJ must also consider: 1) the examining relationship between the medical source and claimant; 2) the treatment relationship, including the length of treatment, frequency of examination, and nature and extent of relationship; 3) support by medical evidence; 4) consistency of the opinion with the record as a whole; 5) the source's area of specialization; and 6) any other factors which support or contradict the opinion.  *Id.*

Ultimately the determination of a claimant's residual functional capacity is "reserved to the Commissioner." 20 C.F.R. §404.1527(e)(2).  There is no doubt that where conclusions regarding a claimant's functional capacity are not substantiated by objective evidence, the ALJ is not required to credit those conclusions.  *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994).  Similarly, although "[g]enerally the opinions of treating physicians are given substantial, if not controlling, deference," they are only given such deference when the opinions are supported by objective medical evidence.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Thus, "if the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for his rejection."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *see also* 20 C.F.R. § 1527(d)(2).

Substantial evidence supports the ALJ's rejection of some of the restrictions and disability opinion offered by Dr. Provaznik in this case.  The ALJ's explanation for discounting some of Dr. Provaznik's opinions was sufficiently articulated in his written opinion to satisfy the regulatory requirement that "good reasons" be specified for any

rejection of a treating physician's opinion. *See* 20 C.F.R. § 404.1527(d)(2), §1527(d)(2). Therefore, Plaintiff's fourth and last assignment of error fails to obtain a different result in this Court.

### III. Conclusion and Recommendation

For the reasons stated herein, **IT IS RECOMMENDED THAT:**

1.    The decision of the Commissioner to deny Plaintiff DIB benefits be **AFFIRMED**;

2.    As no further matters remain pending for the Court's review, this case be **CLOSED.**

　　　　　　　　　　　　　　　　　　　　*/s Stephanie K. Bowman*
　　　　　　　　　　　　　　　　　　　　Stephanie K. Bowman
　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CARLIN DAVID KEPP,                                      Case No. 1:10-cv-542

                    Plaintiff,                                        Dlott, J.
                                                              Bowman, M.J.

        v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

**NOTICE**

        Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written

objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of

the filing date of this R&R.  That period may be extended further by the Court on timely

motion by either side for an extension of time.  All objections shall specify the portion(s)

of the R&R objected to, and shall be accompanied by a memorandum of law in support

of the objections.  A party shall respond to an opponent's objections within **FOURTEEN**

**(14) DAYS** after being served with a copy of those objections.  Failure to make

objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas*

*v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).